UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 15-61 |
| LISA CRINEL, ET AL. | SECTION: "E" (5) |

### ORDER AND REASONS

This is a criminal action charging Abide Home Care Services, Inc. ("Abide")[1] and its associates with a scheme to defraud Medicare.  The Government has moved to disqualify Ike Spears on the basis of an alleged attorney-client relationship formed with Lisa Crinel on March 25, 2014.  Mr. Spears now represents Wilneisha Jakes—Ms. Crinel's daughter and co-defendant.  The question presented is whether this successive representation presents a conflict of interest that requires disqualification.  It does.  The motion is GRANTED, and Mr. Spears is disqualified from representing Ms. Jakes.

### BACKGROUND[2]

At approximately 9:00 a.m. on March 25, 2014, federal agents arrived at the corporate office of Abide to execute a search warrant.  Several employees were already at the office, including Ms. Jakes—the Chief Administrative Officer at Abide.  Ms. Jakes subsequently informed her mother (and boss), Ms. Crinel, of the search.  Ms. Crinel arrived approximately thirty minutes later and contacted her attorney, Clarence Roby.  Due to a prior commitment, Mr. Roby was unable to go to Ms. Crinel's office right away, so he reached out to Mr. Spears.  Mr. Spears was not in his office.  Mr. Roby left a

---

[1] According to the indictment, Abide's full name is "PCAH, Inc. a/k/a Priority Care at Home d/b/a Abide Home Care Services, Inc."
[2] The following facts were adduced largely from an evidentiary hearing on June 26, 2015.  *See* R. Doc. 310.

1

message requesting Mr. Spears to attend the search in his place.  Upon receiving this message, Mr. Spears stopped what he was doing and left for Abide's offices.

Mr. Spears arrived at approximately 10:00 a.m. while the search was ongoing.  After identifying himself as Ms. Crinel's attorney, Mr. Spears was escorted to a room in which Ms. Crinel, Ms. Jakes, and various federal agents were present.  Approximately one hour later, David Belfield—another of Ms. Crinel's attorneys—joined the group.  Mr. Roby arrived one hour after Mr. Belfield.[3]  Mr. Roby, Mr. Belfield, and Mr. Spears remained in the room with Ms. Crinel, Ms. Jakes, and federal agents for an indeterminate amount of time.  At some point, Mr. Roby and Mr. Belfield left Abide's office.  Mr. Spears stayed throughout the entirety of the search, which concluded at approximately 7:00 p.m.

Ms. Crinel convened an employee meeting the next day.  Ms. Crinel explained that her three attorneys—including Mr. Spears—were scheduled to meet with federal agents in Baton Rouge to discuss the search.  Mr. Belfield and Mr. Roby eventually met with agents.  Mr. Spears was not present for this meeting.

At some point after the search, Mr. Spears received a check from Ms. Crinel (through Abide) for five thousand dollars.  Mr. Spears attempted to cash the check.  Because the Government had frozen Ms. Crinel's accounts, the check never cleared.

On or about June 11, 2014, Mr. Roby began working with Assistant United States Attorney Jordan Ginsberg to develop a procedure for reviewing information seized from Abide computers for privileged attorney-client communications.  In an email sent by

---

[3] The evidence is unclear whether Mr. Belfield arrived before Mr. Roby.  For purposes of this motion, the order of arrival between Mr. Belfield and Mr. Roby is immaterial.

2

Mr. Roby to AUSA Ginsberg, Mr. Roby identified Mr. Spears as one of Ms. Crinel's attorneys.[4]

On or about December 3, 2014, the United States Attorney's Office for the Eastern District of Louisiana received an email from Senator Mary Landrieu's office forwarding an email sent by Ms. Crinel (the "December Email").  In the December Email, Ms. Crinel purported to create a "timeline of the federal investigation" in which she identified Mr. Spears, Mr. Roby, and Mr. Belfield as her attorneys.

On March 12, 2015, a federal grand jury in the Eastern of District of Louisiana returned a twenty-six count indictment.[5]  Count 1 charges Abide and seventeen co-defendants with an elaborate conspiracy to commit healthcare fraud.  Count 2 alleges a conspiracy involving eleven defendants to pay and receive illegal healthcare kickbacks.  Ms. Crinel and Ms. Jakes are named defendants in both counts.  The remaining counts allege substantive acts of healthcare fraud related to six Medicare beneficiaries.[6]

## DISCUSSION

The Government contends that Mr. Spears represented Ms. Crinel during the search of Abide's offices and that therefore he should be disqualified from representing Ms. Jakes.  In order to prevail, the Government must prove three things.[7]  First, the Government must establish there was an attorney-client relationship between Mr. Spears and Ms. Crinel on the date of the search.[8]  Second, the Government must

---

[4] The email did not specify when Mr. Spears represented Ms. Crinel or the subject matter of the representation(s).
[5] The Court previously severed Counts 23 through 26.  *See* R. Doc. 263.
[6] Ms. Crinel is a named defendant in each of the remaining counts.  Ms. Jakes is not a named defendant in any of them.
[7] As the party seeking disqualification, the Government bears the burden of proof.  *United States v. DeCay*, 406 F. Supp. 2d 679, 684 (E.D. La. 2005).
[8] *Cf. United States v. Placente*, 81 F.3d 555, 559 (5th Cir. 1996) ("For there to be an actual conflict, there must be an attorney and client relationship to be compromised.").

3

establish this relationship creates a conflict of interest. Third, the Government must establish the conflict is not waiveable.

## I. Attorney-Client Relationship

The existence of an attorney-client relationship *vel non* is governed by the law of the forum state.[9] Under Louisiana law, this inquiry "turns largely on the client's subjective belief . . . ."[10] Ms. Crinel clearly believed Mr. Spears was her attorney during the search on March 25, 2014. In Mr. Spears's own words, he appeared at the search as the "surrogate" or "substitute" attorney for Mr. Roby.[11] Mr. Spears remained by Ms. Crinel's side and did not leave when Mr. Roby arrived. The day after the search, Ms. Crinel announced to her staff that Mr. Spears was her attorney. Ms. Crinel reaffirmed this belief in the December Email and in her attempt to pay Mr. Spears for his services.[12]

Furthermore, Mr. Spears did nothing to disabuse Ms. Crinel of her belief that an attorney-client relationship was formed on March 25, 2014. Mr. Spears remained at Abide's offices until the search concluded. He even attempted to cash the check Ms. Crinel gave him. Had Ms. Crinel revealed confidential information protected by attorney-client privilege, Mr. Spears testified he would not have been able to divulge it.

Given the foregoing, the Court finds there was an attorney-client relationship between Mr. Spears and Ms. Crinel on March 25, 2014. The Court next addresses

---

[9] *See Hopper v. Frank*, 16 F.3d 92, 95 (5th Cir. 1994). The parties agree Louisiana law controls this issue.
[10] *See In re LeBlanc*, 884 So. 2d 552, 557 (La. 2004) (per curiam) (quoting *La. State Bar Ass'n v. Bosworth*, 481 So. 2d 567, 571 (La. 1986)).
[11] Mr. Spears cites no law—nor can this Court find any—to support his position that Louisiana law differentiates between "surrogate" or "substitute" attorney-client relationships and traditional attorney-client relationships. Rather, the relevant inquiry is whether an attorney-client relationship was formed. An attorney's after-the-fact characterization of that relationship is irrelevant.
[12] Although Mr. Spears previously represented Ms. Crinel and her business interests in various unrelated matters, those representations terminated years ago. Thus, as Mr. Spears conceded at the evidentiary hearing, the payment was likely intended as compensation for his services on March 25, 2014.

4

whether the successive representation of Ms. Jakes creates an impermissible conflict of interest.

## II. Conflict of Interest

The analysis begins—as it must—with the Sixth Amendment, which guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This guarantee includes the right of a criminal defendant to retain counsel of his or her choice.[13] But this right is not absolute.[14] As the Supreme Court has recognized, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.[15] Thus, while courts should indulge a presumption in favor of the defendant's counsel of choice, that presumption may be overcome if there is an "actual conflict" or "a serious potential for conflict."[16]

In successive representation cases, a conflict may arise when, *inter alia*, there is a "substantial relationship" between the subject matter of the two representations.[17]  Mr. Spears represented Ms. Crinel during part of the pre-indictment phase of this case.[18] Mr. Spears now represents her co-defendant, Ms. Jakes. Clearly, these representations bear a substantial relationship to each other.

---

[13] *United States v. Gharbi*, 510 F.3d 550, 553 (5th Cir. 2007).
[14] *See United States v. Izydore*, 167 F.3d 213, 220 (5th Cir. 1999) ("[T]he right to counsel of choice is not an unfettered privilege.").
[15] *Wheat v. United States*, 486 U.S. 153, 159 (1988).
[16] *Id.* at 164.
[17] *See Perillo v. Johnson*, 205 F.3d 775, 799–801 (5th Cir. 2000); *Houston v. Schomig*, 533 F.3d 1076, 1081 (9th Cir. 2008) ("Conflicts can . . . arise from successive representation, particularly when a substantial relationship exists between the cases, such that the factual contexts of the two representations are similar or related.") (internal quotation marks omitted).
[18] *Cf. Moss v. United States*, 323 F.3d 455, 462 (6th Cir. 2003) ("[T]he probability of prejudice dramatically increases in circumstances where the attorney represented a co-defendant during the pre-indictment phase of the same proceeding.").

This relationship implicates two distinct duties owed to Ms. Crinel: the duty of confidentiality and the duty of loyalty.[19] Regarding the former, "an attorney may not divulge her client's confidences" or use those confidences to the disadvantage of the client.[20] Both at the evidentiary hearing and in pre-hearing memoranda, Mr. Spears insisted he did not learn any confidential information from Ms. Crinel during the ten-hour search of Abide's office. "[A]n attorney's duty of confidentiality is broader than just client communications, and extends to all confidential information, whether privileged or unprivileged, and whether learned directly from the client or from another source."[21] Thus, whether Mr. Spears learned confidential information *directly* from Ms. Crinel is not dispositive.[22]

Separate and apart from the duty of confidentiality, Mr. Spears owes Ms. Crinel a duty of loyalty, *i.e.*, a duty not to undertake employment adverse to her interests.[23] Ms. Crinel's interests are potentially adverse to Ms. Jakes's interests at each successive stage of the prosecution. If Ms. Jakes pleads guilty prior to trial, she may be called upon by the Government to testify or provide other assistance against Ms. Crinel.[24] In the event Ms. Jakes and Ms. Crinel go to trial, evidence could develop that pits one defendant's interests against the other's.[25] And finally, if both defendants are convicted, they may

---

[19] *See Perillo*, 205 F.3d at 800–01.
[20] *See Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 369 (5th Cir. 1998).
[21] *See Perillo*, 205 F.3d at 799.
[22] *See id.* at 800.
[23] *See id.* at 801.
[24] As Ms. Crinel's daughter and as the Chief Administrative Officer at Abide, Ms. Jakes may have substantial inculpatory information about Ms. Crinel. Thus, Ms. Jakes could be a key witness for the Government.
[25] *See Wheat*, 486 U.S. at 163 ("A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants.").

have "divergent interests at sentencing, when issues such as the defendant's role in the offense and his relationship to other defendants come into play."[26]

In addition to the duties owed to his former client, Mr. Spears owes his current client, Ms. Jakes, "a duty to zealously advocate on her behalf, unhampered by any competing commitments . . . ."[27] According to Mr. Spears, his family and Ms. Crinel's family have been friendly for approximately twenty years. Furthermore, in connection with his work as a political consultant, Mr. Spears frequently solicited and received campaign contributions from Ms. Crinel. In Mr. Spear's own words, Ms. Crinel is "someone who, over the course of time, has demonstrated . . . friendship and loyalty." This longstanding connection to Ms. Crinel places Mr. Spears in a position conducive to divided loyalties.[28]

Mr. Spears's divided loyalties become even more evident in light of Ms. Crinel's demonstrated commitment to keeping Mr. Spears enrolled in this case. In anticipation of the evidentiary hearing, the Court ordered Ms. Jakes to retain new counsel to examine Mr. Spears when he testifies as a witness.[29] Ms. Jakes did not comply with this order herself. Rather, it was Ms. Crinel's current counsel—Sara Johnson—who sought Ms. Jakes's counsel for the hearing. Moreover, although the Government's motion to disqualify was directed at Mr. Spears, it was Ms. Crinel's counsel who was most actively opposing it before and during the evidentiary hearing. Finally, when given the

---

[26] *United States v. Cleveland*, No. CRIM. A. 96–207, 1997 WL 148572, at *5 (E.D. La. Mar. 21, 1997). For example, Ms. Jakes would be entitled to a downward adjustment if she can prove she was a "minimal" or "minor" participant in the charged conspiracies. *See United States Sentencing Guidelines Manual* § 3b1.2 (2014). When making this argument, counsel often "minimize the culpability" of their own client by "emphasizing that of another [defendant]." *See Holloway v. Arkansas*, 435 U.S. 475, 490 (1978).
[27] *Perillo*, 205 F.3d at 801.
[28] *See id.* ("An actual conflict may exist and the Constitution is implicated when an attorney is placed or places himself or herself in a situation inherently conducive to divided loyalties.") (internal quotation marks omitted).
[29] *See* R. Doc. 298. The Government's witness list indicated it would call Mr. Spears as a witness. *See* R. Doc. 274.

opportunity to file post-hearing briefs, Mr. Spears chose not to file a brief but Ms. Johnson did. In short, Ms. Crinel (through her counsel) has expended significant time and resources to advance Mr. Spears's interests and to keep him enrolled in this case. If Mr. Spears successfully opposes the motion to disqualify, he may feel beholden to Ms. Crinel.

Mr. Spears's loyalty to Ms. Crinel may adversely affect his obligations to Ms. Jakes. For example, Mr. Spears may be hesitant to pursue a trial strategy that would exculpate Ms. Jakes but inculpate Ms. Crinel.[30] Mr. Spears contends this fear is purely speculative, because "the defenses of Lisa Crinel and her daughter, Wilneisha Jakes, are not reasonably expected or anticipated to be antagonistic."[31] At this early stage of the prosecution—with trial more than one year away and discovery still ongoing—it is difficult for an attorney to predict the trial strategy of his *own* client,[32] let alone that of a co-defendant (Ms. Crinel) he does not represent. Moreover, complex criminal trials involving multiple defendants are inherently unpredictable.[33] "A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants."[34]

Other examples of potential trial conflicts abound. Mr. Spears may be hesitant to challenge information prejudicial to Ms. Crinel but favorable to Ms. Jakes or vice

---

[30] *Cf. United States v. Bowie*, 892 F.2d 1494, 1500 (10th Cir. 1990) ("Defense counsel's performance was adversely affected by an actual conflict of interest if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests.").
[31] R. Doc. 244, p. 3.
[32] *See United States v. Stewart*, 185 F.3d 112, 122 (3d Cir. 1999) ("[N]otwithstanding an attorney's pretrial assurances otherwise, a defendant's trial strategy is not fixed.").
[33] *See United States v. Phillips*, 952 F. Supp. 480, 484 (S.D. Tex. 1996) ("[E]ven the best and most conscientious counsel cannot always anticipate the twists and turns of a criminal trial.").
[34] *Wheat*, 486 U.S. at 163.

versa.[35] And if Ms. Crinel elects to testify, Mr. Spears may need to cross-examine her, thereby placing him in a position inherently conducive to divided loyalties.[36] In this scenario, Mr. Spears's "zeal in defense of his client the accused is . . . counterpoised against solicitude for his [former] client the witness."[37]

In sum, the successive representation in this case presents a serious potential for conflict for both Ms. Crinel and Ms. Jakes. The remaining question is whether these conflicts are waiveable.

### III. Waiver

Some conflicts—whether actual or potential—are so severe that they cannot be waived by the defendant.[38] In deciding whether to accept a waiver, federal courts must ensure the selection of counsel both "guarantee[s] an effective advocate," and does not compromise "the ethical standards of the profession" or create the appearance of impropriety.[39] This decision "often reflects a judgment call about future events that are far from predictable."[40] As the Supreme Court recognized in *Wheat*:

---

[35] *Cf. Holloway* 435 U.S. at 490. Although *Holloway* addressed concerns inherent in concurrent representations, many of those concerns are present in successive representations as well. *Cf. Perillo*, 205 F.3d at 798 ("Our Court has not definitively embraced the theory that there is any real and inviolate substantive difference between conflicts of interest arising in the context of successive, as opposed to concurrent, representations.").

[36] *See Perillo*, 205 F.3d at 801 ("An attorney who cross-examines a former client inherently encounters divided loyalties.") (quoting *United States v. Voigt*, 89 F.3d 1050, 1078 (3d Cir. 1996)); *see also United States v. Hreljac*, No. 6:06-96-S-DCR, 2007 WL 38372 (E.D. Ky. Jan. 5, 2007) (granting motion to disqualify based on the possibility that an attorney would have to cross-examine a former client indicted with his current client).

[37] *See Perillo*, 205 F.3d at 802 (quoting *Castillo v Estelle*, 504 F.2d 1243, 1245 (5th Cir. 1974)). To be sure, *Perillo* held that "something more" must be shown to demonstrate an actual conflict. But *Perillo* dealt with attorney conflicts from a different angle, namely, on a habeas petitioner's assertion of ineffective assistance of counsel. In order to prevail, a habeas petitioner generally must demonstrate an actual conflict. *See Culyer v. Sullivan*, 446 U.S. 335, 348 (1980). On a motion to disqualify, however, the moving party can prevail by demonstrating "a serious potential for conflict" as opposed to an "actual conflict." *See Wheat*, 486 U.S. at 164.

[38] *See Wheat*, 486 U.S. at 163; *United States v. Vaquero*, 997 F.2d 78, 90 (5th Cir. 1993) ("An accused's right to waive conflict-free representation is not absolute.").

[39] *See Wheat*, 486 U.S. at 159–60

[40] *Cleveland*, 1997 WL 148572, at *4.

9

> [A] district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly. The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics. Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.[41]

For these reasons, district courts are accorded "substantial latitude" in refusing waivers not only where an actual conflict is present "but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.[42]

A serious potential for conflict lurks at every stage of this case. Mr. Spears cannot effectively advocate for Ms. Jakes without violating his duty of loyalty to Ms. Crinel. Conversely, Mr. Spears cannot remain loyal to Ms. Crinel without violating duties owed to Ms. Jakes. This untenable situation precludes the Court from accepting a waiver from either defendant.

---

[41] *Wheat*, 486 U.S. at 162–63.
[42] *Id.* at 163.

## CONCLUSION

Mr. Spears's proposed representation of Ms. Jakes creates a serious potential for conflict that requires disqualification. Mr. Spears shall provide a copy of this Order and Reasons to Ms. Jakes and immediately thereafter terminate the attorney-client relationship. Ms. Jakes must retain new counsel by July 31, 2015.[43]

**New Orleans, Louisiana, this 15th day of July, 2015.**

*Susie Morgan*
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[43] Ms. Jakes will not be prejudiced by this Order, because Mr. Spears emphasized at the hearing that he has not begun extensive document review or other preparation for this case.

11